# EXHIBIT D



19 January 2023

Via Electronic Mail

Integrity Payments Group
Attn: Debra LeJeune
5865 Ridgeway Center Parkway Ste 300
Memphis TN 38120

Re: Letter of Intent for ACH Program

This letter of intent ("**LOI**") sets out the principal terms of building and supporting an ACH program ("**Transaction**") between the Bank of Orrick, with an address of 113 E South Front Street, Orrick, MO 64077, ("**Orrick**" or the "**Bank**") and Integrity Payments Group, with an address of 433 Central Ave, St Petersburg, FL 33701 ("**Integrity**" or the "**Partner**"). The Bank and Integrity may be referred to herein, individually, as a "**Party**" or, collectively, as the "**Parties**".

1. **Non-Binding**. Except for the provisions of Section 4, Section 5, Section 6, and Section 7, this LOI is not binding on the Parties; it is only an expression of basic terms and conditions that the Parties presently intend to incorporate in a formal written agreement that will govern the Transaction ("**Definitive Agreement**"). No binding agreement shall exist with respect to the Transaction unless and until the Definitive Agreement has been duly executed and delivered by both Parties. The Parties shall enter into negotiations with the objective of executing the Definitive Agreement.

2. **Sponsorship**. It is the present intention of the Parties that, upon execution of the Definitive Agreement, Partner would provide the services set out in the attached Exhibit A ("**Services**"). The Definitive Agreement shall contain covenants, conditions, indemnities, representations, and warranties as the Parties shall mutually agree.

3. **Term and Termination**. This LOI will automatically terminate and be of no further force and effect upon the earlier of (i) execution of the Definitive Agreement by Partner and Bank, (ii) a written mutual agreement executed by Partner and Bank, and (iii) May 31, 2023. Notwithstanding anything in the previous sentence, Section 4, Section 5, Section 6, and Section 7 shall survive the termination or expiration of this LOI and the termination or expiration of this LOI shall not affect any rights a Party has with respect to the breach of this LOI by the other Party prior to such termination or expiration.

4. **Governing Law**. This LOI shall be governed by and construed in accordance with the internal laws of the State of Missouri, without giving effect to any choice or conflict of law provision or rule (whether of the State of Missouri or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Missouri.

5. **Confidentiality**. This LOI, the matters discussed herein, and information provided by one Party to the other in connection herewith (collectively, "**Information**") are confidential and shall not be disclosed by the receiving Party without the prior written consent of the other, except to the extent that disclosure is required by law. When disclosure is required, the Party making the disclosure shall provide notice of the intended disclosure to the other Party and shall take all reasonable steps to limit the extent of the disclosure to the minimum required to comply with its legal obligations. Neither party will pursue or engage in any transaction or take any other action, whether directly or indirectly, that would have the purpose or effect of avoiding or circumventing their respective obligations under this Section of this LOI. Neither Party shall have any obligation with respect to any Information that is or becomes publicly available without fault of the Party receiving the Information.

*DL*

6. **No Third-Party Beneficiaries**.  Nothing herein is intended or shall be construed to confer upon any person or entity other than the Parties hereto and their successors or permitted assigns, any rights or remedies under or by reason of this LOI.

7. **Expenses**.  Each of the Parties shall bear its respective costs, charges, and expenses for the business review, preparation, and negotiation of the Definitive Agreement or incurred in connection with the transactions contemplated by this LOI, including, but not limited to, fees of their respective counsel, accountants, and other advisors or consultants.

8. **Miscellaneous**.  Neither this LOI nor any rights or obligations hereunder may be assigned, delegated, or conveyed by either Party without the prior written consent of the other Party. This LOI may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement. The headings of the various sections of this LOI have been inserted for reference only and shall not be deemed to be a part of this LOI.

9. **Public Announcements.** The Parties agree to not make any public announcements regarding the proposed Transaction prior to the execution of the Definitive Agreement without the prior written consent of the other Party. If at any time prior to the execution of the Definitive Agreement a Party is legally required to disclose the existence of the proposed Transaction, before such disclosure such Party shall notify the other Party in writing.

[SIGNATURE PAGE FOLLOWS]

Very truly yours,

BANK OF ORRICK

By: *Chris Bornheimer*

Chris Bornheimer
CEO


If you are in agreement with the terms set forth above and wish to proceed with negotiating the Definitive Agreement for the proposed Transaction on that basis, please sign this LOI in the space provided below and email an electronically executed copy to chrisb@bankoforrick.com.

Agreed to and accepted:

INTEGRITY PAYMENTS GROUP

By: *Debra LeJeune*

Debra LeJeune
CEO

*DL*

**EXHIBIT A**

*FOR DISCUSSION PURPOSES ONLY*

| | |
|---|---|
| **Bank:** | Bank of Orrick |
| **Partner:** | Integrity Payments Group LLC |
| **Program Outline:** | The Bank's duties shall include the Bank Sponsorship program for the purposes of the processing of ACH transactions and wire transfers on the Bank's operating system/tech partner on behalf of Integrity. |

Integrity's primary obligations will be as follows:

- Assist in developing Orrick's policies and procedures; including but not limited to OFAC, AML, Complaint, Privacy, etc.
- Provide sales, marketing, business development strategies and execution
- Support branding and program awareness
- Originate sales to diversified businesses and industries other than only short-term online lenders and those involved in the tribal lending industry
- Support Cross selling and marketing additional bank products and bank referrals as requested by Bank
- Provide strategies to maintain margins and sales based on value
- Assist in program risk mitigation and parameters based on program overall with each merchant
- Assist in all aspects of program foundation and structure
- Provide program strategy and execute in coordination and approval of bank
- Provide complete vetting and packaging of each merchant submission
- Each program application package will have a specific check list, package components and will include an executive summary memo with all credit criteria and IPG recommendations. All documents and checklists will be based on program guidelines as defined by Orrick and Integrity. Completed package will be submitted to Bank for final approval
- Actively originate, manage, monitor, and service each account in coordination with bank associates/account manager/risk team
- Participate in all bank training and credit meetings as requested
- Manage a program score card to assure alignment and program results are meeting expectations and pivot as needed
- Actively promote bank deposit accounts for Integrity clients, assuming the deposit capabilities serve the clients' needs

**Term:** Two (2) years with a mutual option for an additional one (1) year terms thereafter. Early termination (without penalty) permitted in certain defined circumstances.

**Revenue Share:**
- Net Revenue will be split 45% to Integrity, 55% to the Bank. "**Net Revenue**" is defined as Gross Revenue charged to the client for ACH processing (to include any per transaction, per file, or other ACH or Wire related charges) less charges from any payment processing platform, technology platform, software, Federal Reserve, Nacha, RTP, Fed Now, or any other charge related to the processing of the client transaction. This is not to include general bank overhead, including payment processing staff, computer hardware, rent, or other non-direct overhead.

*DL*

- The Net Revenue split could be revisited or renegotiated as deemed appropriate by the Bank and Integrity once the Bank has full digital banking capabilities, specifically a fully developed digital deposit platform.
- The Bank expects net ACH margins to be at a minimum subject to any adjustments made for specific merchant needs as mutually agreed by the parties:
    - High risk clients of $0.35
    - Mid risk clients of $0.20
    - Low risk clients of $0.10
- The Bank and Integrity will discuss a share or revenue clawback capability for any potential loss related to anything Integrity has control over, potentially including losses related to legal, network, or regulatory fines or disputes if a portion of the root cause was directly caused by Integrity or an Integrity client.

**Exclusivity:**

- The Bank agrees to a 12-month exclusivity from the date of the agreement relating to the short-term online lender or tribal lenders, subject to an extension as mutually agreed upon by the Parties in the Definitive Agreement. The foregoing exclusivity does not include (1) any clients that have a Banking as a Service ("**BaaS**") relationship with the Bank prior to Bank and Integrity entering into the Definitive Agreement, or (2) clients referred to Bank through any of its BaaS relationships outside of Integrity.
- Any clients referred directly by Integrity to Bank prior to the Parties executing the Definitive Agreement are recognized to be Integrity clients for the purpose of the Definitive Agreement.
- Any client directed or referred to the Bank through Integrity or partners that may reach out directly to the Bank would be considered an Integrity client.

*DL*